**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **ELVA MENDOZA**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**GRYPHON HEALTHCARE, LLC,**<br>a Delaware limited liability company<br><br>Defendant. | **CIVIL ACTION NO. 4:24-cv-4224**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

1.     Plaintiff Elva Mendoza ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant Gryphon Healthcare, LLC ("Gryphon" or "Defendant"), based upon personal knowledge as to herself and her own acts, and as to all other matters upon information and belief, based upon, *inter alia*, the investigations of her attorneys.

## NATURE OF THE ACTION

2.     Gryphon is a revenue cycle management ("RCM") provider for healthcare providers across the country. RCM is a financial process used by healthcare providers to track patient care milestones such as registration, appointment scheduling, and payment. RCM providers such as Gryphon use medical billing software to itemize and categorize the services and treatments patients receive from healthcare providers. Then, once the information is gathered, RCM providers like Gryphon, submit that information to health insurance carriers to effectuate payment of claims.

3.     As a necessary part of this process, Gryphon collects, aggregates, stores and transfers large amounts of sensitive patient Personal Identifying Information ("PII") and Protected Health Information ("PHI") (together, "Private Information"). The Private Information collected

by Gryphon includes, *inter alia*, patient names, dates of birth, addresses, Social Security numbers, dates of service, diagnosis information, health insurance information, medical treatment information, prescription information, provider information, medical record numbers, and payment information. Patients reasonably expect that their Private Information, when given to RCM providers such as Gryphon, will be protected and safeguarded from unauthorized third-party disclosure by those RCM providers.

4.      On or around August 13, 2024, Gryphon became aware of a data security incident which resulted in unauthorized access to certain Private Information maintained by Gryphon (the "Data Breach"). As a result of this Data Breach, unauthorized third-party hackers were able to access, acquire and exfiltrate certain files and data containing the Private Information of patients to whom Gryphon provides medical billing services. According to Gryphon's filing with the Office of the Maine Attorney General, this Data Breach has impacted the sensitive data of at least 393,358 individuals.[1]

5.      Under applicable statutes and regulations, Gryphon had a duty to implement reasonable, adequate industry-standard data security policies safeguards to protect patient Private Information entrusted to it. Despite this, Gryphon failed to meet these duties and failed to implement such reasonable and adequate safeguards. Instead, Gryphon failed to, among others, properly monitor its computer networks and systems which housed sensitive patient Private Information, properly maintain a secure cyber environment, and failed to properly vet or train its employees, contractors and agents in the secure handling of patient Private Information.

6.      Furthermore, Gryphon has not offered assurances that the stolen Private Information has been destroyed or will not be misused in the future. Nor has Gryphon offered

---

[1]    Office of the Maine Attorney General,  https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/07b59e7d-72e9-4bbe-abcb-dca588c27e65.html (last visited Oct. 23, 2024).

assurances that it has now implemented reasonable and adequate data security safeguards to prevent future data breaches, despite it continuing to hold store patient Private Information.

7.      Plaintiff, individually and on behalf of those similarly situated persons ("Class Members"), brings this Class Action to secure redress against Gryphon for its reckless and negligent violation of their privacy rights. Plaintiff and Class Members are current patients and former patients of healthcare providers that utilized Gryphon's services who, as current and former patients, had their Private Information collected, stored and ultimately breached by Gryphon.

8.      Plaintiff and Class Members have suffered injuries and damages. As a result of Gryphon's wrongful actions and inactions, Plaintiff's and Class Members' Private Information have been compromised. Plaintiff and Class Members have had their privacy rights violated and they are now exposed to a heightened risk of identity theft and credit fraud for the rest of their lifetimes. Plaintiff and Class Members must now spend time and money on prophylactic measures, such as increased monitoring of their personal and financial accounts and the purchase of credit monitoring services, to protect themselves from future loss. Plaintiff and Class Members have also lost the value of their Private Information, along with the benefit of their bargains.

9.      As a result of Gryphon's wrongful actions and inactions, patient Private Information was stolen. Plaintiff and Class Members have had their Private Information compromised by nefarious third-party hackers, have had their privacy rights violated, have been exposed to the risk of fraud and identify theft, and have otherwise suffered damages. Plaintiff and Class Members bring this action to secure redress against Gryphon.

## **THE PARTIES**

10.      Plaintiff is a resident of Anahuac and citizen of the State of Texas. On or around October 11, 2024, she received a data breach notice from Gryphon informing her that her Private

Information—including, *inter alia*, her name, date of birth, address, Social Security number, dates of service, diagnosis information, health insurance information, medical treatment information, prescription information, provider information, and medical record number—had been accessed by unauthorized third party hackers as a result of the Data Breach.

11.     Since the Data Breach occurred, Plaintiff has experienced increased signs and attempts of fraud on her personal and financial accounts—including, *inter alia*, attempts to access her bank accounts and to obtain fraudulent loans under her name. These fraud attempts have forced Plaintiff to place a credit lock through a credit monitoring service that she pays for and will continue to require into the foreseeable future. Additionally, Plaintiff has experienced a marked increase in spam calls. Plaintiff has and will spend substantial time dealing with and resolving these issues.

12.     As a result of the above and after learning of the Data Breach, Plaintiff has experienced increased feelings of anxiety and paranoia. This has caused Plaintiff to spend an increased amount of time dealing with the fallout of the Data Breach, such as monitoring her personal and financial accounts. To date, Plaintiff estimates that she has spent at least 30 hours dealing with the Data Breach.

13.     Gryphon is a Delaware limited liability company with its principal place of business at 4700 West Sam Houston Parkway North, Suite 140, Houston, Texas 77041-8222. Defendant's agent for service of process is Cogency Global, Inc., who can be served at 1601 Elm Street, Suite 4360, Dallas, Texas 75201.

### JURISDICTION AND VENUE

14.     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 for claims that arise under the Stored Communications Act, 18 U.S.C. § 2701, *et seq*. The

Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the state claims because they are so related to the federal claims in that they form a part of the same case or controversy.

15.     Additionally, this Court has subject matter jurisdiction over the state law claims asserted herein pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because upon the original filing of this complaint: (1) there exist putative Class Members, such as Plaintiff, that are citizens of States diverse from Defendant;[2] (2) there are more than 100 putative Class Members; (3) and the amount in controversy exceeds $5 million.

16.     The Court also has personal jurisdiction over Defendant because it is headquartered in and routinely conducts business in the state of Texas and has sufficient minimum contacts in Texas to have intentionally availed itself to this jurisdiction by operating and marketing its services in Texas.

17.     Venue is proper in this District because, among other things: (a) Plaintiff is a resident of this District and a citizen of this state; (b) Defendant is a resident of this District and directed its activities at residents in this District; and (c) many of the acts and omissions that give rise to this action took place in this judicial District for services provided in this District.

## FACTUAL ALLEGATIONS

**A.     The Data Breach**

18.     Gryphon is a covered entity under the Health Insurance Portability and Accountability Act ("HIPAA") that collects, aggregates, and stores patient Private Information from the various healthcare providers ("RCM Clients") for whom it provides RCM services.

---

[2] For instance, citizens of the State of Texas and the State of Maine were affected by the Data Breach. Office of the Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/07b59e7d-72e9-4bbe-abcb-dca588c27e65.html (last visited Oct. 23, 2024).

19.    As a condition for providing its RCM services, Gryphon requires that its RCM Clients provide it with highly sensitive patient Private Information belonging to their patients. Gryphon thus collects, aggregates, and stores that patient Private Information in the ordinary course of its business.

20.    Gryphon's contractual relationship with its RCM Clients incorporates Gryphon's promise to maintain reasonable and adequate data security safeguards to keep secure patient Private Information provided to Gryphon. Those safeguards include compliance with applicable laws and data security industry standards appropriate to the patient Private Information Gryphon collects.

21.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Gryphon assumed legal and equitable duties it owed to them and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure and exfiltration.

22.    On or around August 13, 2024, Gryphon discovered the Data Breach, wherein its systems were accessed by unauthorized third-party hackers, who exfiltrated Plaintiff's and Class Members' sensitive Private Information—including, *inter alia*, their names, dates of birth, addresses, Social Security numbers, dates of service, diagnosis information, health insurance information, medical treatment information, prescription information, provider information, medical record number, and potentially payment information. At least 393,358 individuals were affected.

23.    This Data Breach was the direct result of Gryphon's failure to implement reasonable and adequate data security safeguards as required by statute and regulation.

24.     Despite knowing the importance of protecting patient Private Information, Gryphon ignored well-known safety risks and failed to provide adequate security to protect the patient Private Information it collected, aggregated and stored. As a result, Gryphon knowingly divulged patient Private Information by failing to take commercially reasonable measures to protect its patients' Private Information, failing to adhere to applicable and statutorily required security and privacy standards.

**B.     Gryphon's Duty to Protect Private Information Under State and Federal Law**

25.     The duty of businesses such as Gryphon to protect the Private Information that its patients entrust to it is recognized under Texas law, which states that entities such as Gryphon, who acquire, maintain, store and use personal information, "shall establish, implement, and maintain reasonable administrative, technical, and physical data security practices that are appropriate to the volume and nature of the personal data at issue." Tex. Bus. & Com. Code § 541.101(2).

26.     Further, as a covered entity under HIPAA, Gryphon holds a statutory duty under HIPAA and other federal and state statutes to safeguard Plaintiff's and Class Members' Private Information.

27.     Under the HIPAA Privacy Rule, Gryphon is required to:

a.  Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives maintains or transmits;

b.  Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c.  Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d.  Ensure compliance by their workforce.

45 C.F.R. § 164.306(a).

7

28.     The HIPAA Privacy Rule also requires Gryphon to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information" under 45 C.F.R. § 164.306(e) and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights" under 45 C.F.R. § 164.312(a)(1).

29.     Further, the Federal Trade Commission Act, 15 U.S.C. § 45 prohibits Gryphon from engaging in "unfair or deceptive acts or practices affecting commerce." The Federal Trade Commission has found that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the Federal Trade Commission Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 243 (3rd Cir. 2015).

30.     Gryphon failed to comply with each of these state and federal statutes by failing to implement and maintain reasonable security procedures to protect Plaintiff's and Class Members' Private Information.

## C.     Applicable Standards of Care

31.     In addition to its obligations under state and federal law, Gryphon owed a duty to Plaintiff and the Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Gryphon owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer system and networks, and the personnel responsible for them, adequately protected the Private Information of Plaintiff and Class

Members.

32. Gryphon owed a duty to Plaintiff and Class Members to design, maintain, and test its computer system to ensure that the Private Information in Defendant's possession was adequately secured and protected.

33. Gryphon owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed the Private Information in Gryphon's possession, adequately training its employees and others who accessed Private Information in its computer systems on how to adequately protect Private Information, and adequately vetting the data security of any RCM clients, third-party agents, vendors or programs to which it provided access to patient Private Information.

34. Gryphon owed a duty of care to Plaintiff and Class Members to implement processes that would detect a breach of its data security systems in a timely manner.

35. Gryphon owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

36. Gryphon owed a duty to Plaintiff and Class Members to disclose if its computer systems and data security practices were inadequate to safeguard individuals' Private Information from theft because such an inadequacy would be a material fact in the decision to provide or entrust their Private Information to Gryphon.

37. Gryphon owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when the data breach occurred.

38. Gryphon owed a duty of care to Plaintiff and the Class Members because they were foreseeable and probable victims of any inadequate data security practices. Gryphon received

9

Private Information from Plaintiff and Class Members with the understanding that Plaintiff and Class Members expected their Private Information to be protected from disclosure. Gryphon knew that a breach of its data systems would cause Plaintiff and Class Members to incur damages.

**D.    Stolen Information Is Valuable to Hackers and Thieves**

39.    It is well known, and the subject of many media reports, that Private Information is highly coveted and a frequent target of hackers. Especially in the technology industry, the issue of data security and threats thereto is well known. Despite well-publicized litigation and frequent public announcements of data breaches, Gryphon opted to maintain an insufficient and inadequate system to protect the Private Information of Plaintiff and Class Members.

40.    Plaintiff and Class Members value their Private Information, as in today's electronic-centric world, their Private Information is required for numerous activities, such as new registrations to websites, or opening a new bank account, as well as signing up for special deals.

41.    Legitimate organizations and criminal underground alike recognize the value of Private Information. That is why they aggressively seek and pay for it.

42.    Private Information is highly valuable to hackers. Identity thieves use stolen Private Information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. Private Information that is stolen from the point of sale are known as "dumps."[3]

43.    Once someone buys Private Information, it is then used to gain access to different areas of the victim's digital life, including bank accounts, social media, and credit card details. During that process, other sensitive data may be harvested from the victim's accounts, as well as from those belonging to family, friends, and colleagues.

---

[3]    *See All About Fraud: How Crooks Get the CVV*, Krebs on Security (April 26, 2016), https://krebsonsecurity.com/2016/04/all-about-fraud-how-crooks-get-the-cvv/

44.     In addition to Private Information, a hacked email account can be very valuable to cybercriminals. Since most online accounts require an email address not only as a username, but also to verify accounts and reset passwords, a hacked email account could open up a number of other accounts to an attacker.[4]

45.     As shown below, a hacked email account can be used to link to many other sources of information for an identity thief, including any purchase or account information found in the hacked email account.[5]



46.     Hacked information can also enable thieves to obtain other personal information through "phishing." According to the Report on Phishing available on the United States, Department of Justice's website: "AT&T, a large telecommunications company, had its sales system hacked into, resulting in stolen order information including full names and home addresses,

---

[4]     *Identity Theft and the Value of Your Personal Data*, Trend Micro (Apr. 30, 2015), https://www.trendmicro.com/vinfo/us/security/news/online-privacy/identity-theft-and-the-value-of-your-personal-data.

[5]     Brian Krebs, *The Value of a Hacked Email Account*, Krebs on Security (June 13, 2013), https://krebsonsecurity.com/2013/06/the-value-of-a-hacked-email-account/

order numbers and credit card numbers. The hackers then sent each customer a highly personalized e-mail indicating that there had been a problem processing their order and re-directing them to a spoofed website where they were prompted to enter further information, including birthdates and Social Security numbers."[6]

**E.    The Data Breach Has and Will Result in Additional Identity Theft and Identity Fraud**

47.    Gryphon failed to implement and maintain reasonable security procedures and practices appropriate to protect the Private Information of Plaintiff and Class Members. The ramification of Gryphon's failure to keep Plaintiff's and Class Members' data secure is severe.

48.    Between 2005 and 2019, at least 249 million individuals were affected by health care data breaches.[7] In 2019 alone, over 505 data HIPAA data breaches were reported, resulting in over 41 million healthcare records being exposed, stolen, or unlawfully disclosed.[8] The frequency and severity of healthcare data breaches has only increased with time. 2021 was reported as the "worst ever year" for healthcare data breaches—with at least 44,993,618 healthcare records having been exposed or stolen across 585 breaches.[9]

49.    It is incorrect to assume that reimbursing a consumer for a financial loss due to fraud makes that individual whole again. On the contrary, after conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, about a third (32%) spent a month or more resolving

---

[6]    *Report on Phishing* (Oct. 2006), https://www.justice.gov/archive/opa/docs /report_on_phishing.pdf
[7]    *Healthcare Data Breaches: Insights and Implications*, National Library of Medicine (May 13, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/ (last visited on Oct. 23, 2024).
[8]    *December 2019 Healthcare Data Breach*, HIPAA Journal (Jan 21, 2020), https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ (last visited on Oct. 23, 2024).
[9]    "Largest Healthcare Data Breaches of 2021," HIPAA Journal (Dec. 30, 2021).

problems."[10] In fact, the BJS reported, "resolving the problems caused by identity theft [could] take more than a year for some victims." *Id*.

**F.      Annual Monetary Losses from Identity Theft Are in the Billions of Dollars**

50.      Javelin Strategy and Research reports that losses from identity theft reached $21 billion in 2013. There may be a time lag between when harm occurs and when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO, Report to Congressional Requesters (June 2007), http://www.gao.gov/new.items/d07737.pdf.

51.      This is particularly the case with HIPAA data breaches such as Gryphon's, as the information implicated, such as Social Security numbers or medical history, cannot be changed. Once such information is breached, malicious actors can continue misusing the stolen information for years to come. Indeed, medical identity theft is one of the most common, most expensive, and most difficult-to-prevent forms of identity theft.[11] Victims of medical identity theft "often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[12]

---

[10]    *See Victims of Identity Theft*, U.S. Department of Justice (September 2015, revised November 13, 2017)
[11]    Michael Ollove, *The Rise of Medical Identity Theft in Healthcare* (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/ (last visited on Oct. 23, 2024).
[12]    *Id.*

13

52. Indeed, a study by Experian found that the average total cost of medical identity theft is "nearly $13,500" per incident, and that many victims were forced to pay out-of-pocket costs for fraudulent medical care.[13] Victims of healthcare data breaches often find themselves "being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores."[14]

53. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any financial or identity fraud they suffer.

**G.    Plaintiff and Class Members Suffered Damages**

54. The exposure of Plaintiff's and Class Members' Private Information to unauthorized third-party hackers was a direct and proximate result of Gryphon's failure to properly safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized access, use, and disclosure, as required by and state and federal law. The Data Breach was also a result of Gryphon's failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' Private Information in order to protect against reasonably foreseeable threats to the security or integrity of such information, as required under state and federal law.

55. Plaintiff's and Class Members' Private Information is private and sensitive in nature and was inadequately protected by Gryphon. Gryphon did not obtain Plaintiff's and Class

---

[13]   *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (June 14, 2018),   https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last visited Oct. 23, 2024).

[14]   *Id.*

Members' consent to disclose their Private Information, except to certain persons not relevant to this action, as required by applicable law and industry standards.

56.    As a direct and proximate result of Gryphon's wrongful actions and inaction and the resulting data breach, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing risk of harm from identity theft and identity fraud, requiring them to take the time and effort to mitigate the actual and potential impact of the subject data breach on their lives by, among other things, paying for credit and identity monitoring services, spending time on credit and identity monitoring, placing "freezes" and "alerts" with credit reporting agencies, contacting their personal, financial and healthcare institutions, closing or modifying personal, financial or healthcare accounts, and closely reviewing and monitoring their credit reports, financial accounts and healthcare accounts for unauthorized activity. As a result, Plaintiff and Class Members have lost time—in the form of the increased time monitoring their personal and financial accounts and dealing with the fallout of the Data Breach—and money—in the form of any out-of-pocket expenses incurred as a result of the data breach, including necessary purchases of credit or identity monitoring services to assist in the former.

57.    Plaintiff and Class Members have also lost the value of their Private Information. Private Information is a valuable commodity, as evidenced by numerous companies which purchase Private Information from consumers, such as UBDI, which allows its users to link applications like Spotify, Twitter, or Apple Health and opt-in to paid opportunities to earn income, and Brave, which uses a similar business model, and by market-based pricing data involving the sale of stolen Private Information across multiple different illicit websites.

58.    Top10VPN, a secure network provider, compiled pricing information for stolen Private Information, including $160.15 for online banking details, $35.00 for credit reports, and

15

$62.61 for passports. Standalone Yahoo email accounts have been listed for as little as $0.41, while banking logins are in the range of $500, and verified Paypal accounts with high balances are listed at as much as $2,000.

59.     In addition, Privacy Affairs, a cyber security research firm, has listed the following prices for stolen Private Information:

| | |
|---|---|
| U.S. driving license, high quality: | $550 |
| Auto insurance card: | $70 |
| AAA emergency road service membership card: | $70 |
| Wells Fargo bank statement: | $25 |
| Wells Fargo bank statement with transactions: | $80 |
| Rutgers State University student ID: | $70 |

60.     Healthcare data is particularly valuable on the black market because it often contains an individual's Private Information, including information, such as a Social Security number or diagnosis and medical treatment information, that is not easily, or outright cannot be changed in response to a data breach. As a result, a healthcare data record may be valued at up to **$250 per record**.[15]

61.     Finally, Plaintiff and Class Members have lost the benefit of their bargains. Plaintiff and Class Members would not have paid for medical services from healthcare providers using Gryphon's services had they been aware that that their Private Information would be provided to Gryphon and subsequently stored and transferred in unsecure data environments. As a result, Plaintiff and Class Members are entitled to, at minimum, the difference between what they would have paid for their medical services had it included RCM services that would store and transfer their data securely and the medical services that they actually paid for that did not.

---

[15]   "2018 Trustwave Global Security Report," TRUSTWAVE          https://trustwave.azureedge.net/media/15350/2018-trustwave-global-security-report-prt.pdf?rnd=131992184400000000

62.     Gryphon's wrongful actions and inactions directly and proximately caused the theft and dissemination into the public domain of Plaintiff's and Class Members' Private Information, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

   a.   The improper disclosure and theft of their Private Information;

   b.   The imminent and impending injury flowing from potential fraud and identity theft posed by their Private Information being exposed to and misused by unauthorized third-party hackers;

   c.   The untimely and inadequate notification of the Data Breach;

   d.   Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach; and

   e.   Ascertainable losses in the form of deprivation of the value of their Private Information, for which there is a well-established national and international market.

   f.   Ascertainable losses in the form of Plaintiff's and Class Members' lost benefit of the bargains.

63.     By failing to take reasonable steps to safeguard Plaintiff's and Class Members' Private Information while in electronic storage, Gryphon has allowed unauthorized access to its electronic systems and knowingly divulged patient Private Information.

64.     The Stored Communications Act ("SCA"), 18 U.S.C. § 2702(a)(2)(A) provides that "a person or entity providing remote computing service to the public shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that

17

service on behalf of, and received by means of electronic transmission from (or created by means of computer processing or communications received by means of electronic transmission from), a subscriber or customer of such service." 18 U.S.C. § 2702(a)(2)(A).

65. "Remote computing service" is defined as "the provision to the public of computer storage or processing services by means of an electronic communications system." 18 U.S.C. § 2711(2).

66. "Electronic communications system" is defined as "any wire, radio, electromagnetic, photo-optical or photo electronic facilities for the transmission of wire or electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications." 18 U.S.C § 2510(14).

67. Gryphon stores patient Private Information and utilizes such information to provide services to its patients.

68. By failing to take reasonable steps to safeguard Private Information and allowing its computer systems to be breached, Gryphon knowingly divulged Plaintiff's and Class Members' Private Information, and which allowed unauthorized persons to access and use the Private Information for improper purposes.

69. Upon learning that its systems had been intruded upon and information had been obtained and accessed by unauthorized third parties, Gryphon failed to promptly inform Plaintiff and Class Members of the Data Breach and continued to knowingly divulge Private Information to third parties.

**H.     Class Action Allegations**

70. Plaintiff brings this claim on her own behalf and pursuant to the Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4). Plaintiff intends to seek certification of the

following Class, initially defined as follows:

> All persons residing in the United States of America who received a data breach notice informing them that their Private Information had been breached by unauthorized third parties as a result of Gryphon Healthcare, LLC's data breach.

71.     Excluded from each of the above Class is Gryphon, including any entity in which Gryphon has a controlling interest, is a parent or subsidiary, or which is controlled by Gryphon, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Gryphon. Also excluded are the judge and the court personnel in this case and any members of their immediate families. Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

72.     *Numerosity*, Fed. R. Civ. P. 23(a)(1):  The members of the Class are so numerous that the joinder of all members is impractical. Presently, Plaintiff is aware of at least 393,358 potential Class Members. The disposition of the claims of Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Gryphon's possession, custody, or control, such as reservation receipts and confirmations.

73.     *Commonality*, Fed. R. Civ. P. 23(a)(2) and (b)(3): There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

> a.  Whether Gryphon took reasonable steps and measures to safeguard Plaintiff's and Class Members' Private Information—including *inter alia*, properly vetting the data security of its third party agents and vendors prior to providing them access to patient Private Information;

19

b. Whether Gryphon violated common and statutory law by failing to implement reasonable security procedures and practices;

c. Which security procedures and which data-breach notification procedure should Gryphon be required to implement as part of any injunctive relief ordered by the Court;

d. Whether Gryphon knew or should have known of the security breach prior to the disclosure;

e. Whether Gryphon complied with any implied contractual obligation to use reasonable security measures;

f. Whether Gryphon's acts and omissions described herein give rise to a claim of negligence;

g. Whether Gryphon knew or should have known of the security breach prior to its disclosure;

h. Whether Gryphon had a duty to promptly notify Plaintiff and Class Members that their Private Information was, or potentially could be, compromised;

i. What security measures, if any, must be implemented by Gryphon to comply with its duties under state and federal law;

j. The nature of the relief, including equitable relief, to which Plaintiff and the Class Members are entitled; and

k. Whether Plaintiff and Class Members are entitled to damages, civil penalties, and/or injunctive relief.

74.     *Typicality*. Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was misused and/or disclosed by Gryphon.

75.     *Adequacy of Representation*, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff has retained competent counsel experienced in litigation of class actions, including consumer and data breach class actions, and Plaintiff intends to prosecute this action vigorously. Plaintiff's claims are typical of the claims of Class Members and Plaintiff has the same non-conflicting interests as the other Class Members. Therefore, the interests of the Class will be fairly and adequately represented by Plaintiff and her counsel.

76.     *Superiority of Class Action*, Fed. R. Civ. P. 23(b)(3): A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class Members is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

77.     Damages for any individual Class Member are likely insufficient to justify the cost of individual litigation so that, in the absence of class treatment, Gryphon's violations of law inflicting substantial damages in the aggregate would go un-remedied.

78.     Class certification is also appropriate under Federal Rule of Civil Procedure 23(a) and (b)(2), because Gryphon has acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

79.     Plaintiff and Class Members have suffered actual injury and are entitled to damages in an amount to be proven at trial but in excess of the minimum jurisdictional requirement of this Court.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of the Stored Communications Act, 18 U.S.C. §§ 2701, *et seq.*

80.     Plaintiff repeats and incorporates herein by reference each and every allegation above, inclusive, of this Complaint as if set forth fully herein.

81.     The SCA, 18 U.S.C. §§ 2701, *et seq.* provides consumers with redress if a company mishandles their electronically stored information, such as Private Information. The SCA was designed, in part, to protect individuals' privacy interests in personal and proprietary information.

82.     Section 2702(a)(1) of the SCA states that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

83.     "Electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

84.     Through its computer equipment, Gryphon provides an "electronic communication service to the public" within the meaning of the SCA.

85.     By failing to implement reasonable and adequate data security safeguards to protect Plaintiff and Class Member's sensitive Private Information, despite reasonably knowing that said Private Information was a high-risk target for third-party hackers, Gryphon knowingly divulged the contents of the electronic communication service it provides—in violation of the SCA.

22

86.     As a direct and proximate result of Gryphon's violations of the SCA, Plaintiff and Class Members were injured. Plaintiff and Class Members were damaged because their Private Information was accessed by unauthorized third-party hackers, resulting in an increased risk of identity theft, property theft and extortion for which Plaintiff and Class Members were forced to adopt preventative and remedial efforts. In addition, Plaintiff and Class Members were damaged in that they must now spend copious amounts of time combing through their records and monitoring their personal and financial accounts to ensure that they do not become the victims of fraud and/or identity theft as a result of the Data Breach. Finally, Plaintiff and Class Members have lost the value of their stolen Private Information, as well as the benefits of their bargains.

87.     Plaintiff and Class Members have suffered actual injury and are entitled to damages in an amount to be proven at trial but in excess of the minimum jurisdictional requirement of this Court.

## COUNT II

### Negligence

88.     Plaintiff repeats and incorporates herein by reference each and every allegation above, inclusive, of this Complaint as if set forth fully herein.

89.     Gryphon owed Plaintiff and the Class Members a duty of care in the handling of its patients' Private Information. This duty included, but was not limited to, keeping that Private Information secure and preventing disclosure of the Private Information to any unauthorized third parties. This duty of care existed independently of Gryphon's contractual duties to Plaintiff and Class Members. Under the FTC Guidelines, and other sources of industry-wide cybersecurity standards, Gryphon is obligated to incorporate adequate measures to safeguard and protect Private Information that is entrusted to it in its ordinary course of business and transactions with customers.

90.     Pursuant to Texas Business and Commercial Code § 541.101(2), Gryphon was required to "implement, and maintain reasonable administrative, technical, and physical data security practices that are appropriate to the volume and nature of the personal data at issue," which included the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information from unauthorized access, destruction, use, modification or disclosure."

91.     Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, Gryphon had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information. The Federal Trade Commission (FTC) has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the businesses' failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders from these actions further clarify the measures businesses are required to undertake to satisfy their data security obligations.[16]

92.     Additional industry guidelines which provide a standard of care can be found in NIST's *Framework for Improving Critical Infrastructure Cybersecurity*.[17] NIST's Framework identifies seven steps for establishing or improving a cybersecurity program (section 3.2). Those steps are:

> *Step 1: Prioritize and Scope*. The organization identifies its business/mission objectives and high-level organizational priorities. With this information, the organization makes strategic decisions

---

[16] Federal Trade Commission, *Privacy and Security Enforcement: Press Releases*, https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement (last visited Oct. 23, 2024).

[17] "Framework for Improving Critical Infrastructure Cybersecurity," National Institute for Standards and Technology, https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.

regarding cybersecurity implementations and determines the scope of systems and assets that support the selected business line or process. The Framework can be adapted to support the different business lines or processes within an organization, which may have different business needs and associated risk tolerance. Risk tolerances may be reflected in a target Implementation Tier.

*Step 2: Orient*. Once the scope of the cybersecurity program has been determined for the business line or process, the organization identifies related systems and assets, regulatory requirements, and overall risk approach. The organization then consults sources to identify threats and vulnerabilities applicable to those systems and assets.

*Step 3: Create a Current Profile*. The organization develops a Current Profile by indicating which Category and Subcategory outcomes from the Framework Core are currently being achieved. If an outcome is partially achieved, noting this fact will help support subsequent steps by providing baseline information.

*Step 4: Conduct a Risk Assessment*. This assessment could be guided by the organization's overall risk management process or previous risk assessment activities. The organization analyzes the operational environment in order to discern the likelihood of a cybersecurity event and the impact that the event could have on the organization. It is important that organizations identify emerging risks and use cyber threat information from internal and external sources to gain a better understanding of the likelihood and impact of cybersecurity events.

*Step 5: Create a Target Profile*. The organization creates a Target Profile that focuses on the assessment of the Framework Categories and Subcategories describing the organization's desired cybersecurity outcomes. Organizations also may develop their own additional Categories and Subcategories to account for unique organizational risks. The organization may also consider influences and requirements of external stakeholders such as sector entities, customers, and business partners when creating a Target Profile. The Target Profile should appropriately reflect criteria within the target Implementation Tier.

*Step 6: Determine, Analyze, and Prioritize Gaps*. The organization compares the Current Profile and the Target Profile to determine gaps. Next, it creates a prioritized action plan to address gaps – reflecting mission drivers, costs and benefits, and risks – to achieve the outcomes in the Target Profile. The organization then determines resources, including funding and workforce, necessary to address

25

the gaps. Using Profiles in this manner encourages the organization to make informed decisions about cybersecurity activities, supports risk management, and enables the organization to perform cost-effective, targeted improvements.

*Step 7: Implement Action Plan*. The organization determines which actions to take to address the gaps, if any, identified in the previous step and then adjusts its current cybersecurity practices in order to achieve the Target Profile. For further guidance, the Framework identifies example Informative References regarding the Categories and Subcategories, but organizations should determine which standards, guidelines, and practices, including those that are sector specific, work best for their needs.

93.    In addition to its obligations under state and federal regulations and industry standards, Gryphon owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in Gryphon's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Gryphon owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems and networks, and the personnel responsible for them, adequately protected the Private Information of Plaintiff and Class Members.

94.    Gryphon owed a duty to Plaintiff and Class Members to properly ensure the data security environment of its RCM Clients, third-party agents, vendors and programs that it provided access to patient Private Information.

95.    Gryphon owed a duty to Plaintiff and Class Members to design, maintain, and test its internal data systems to ensure that the Private Information in Gryphon's possession was adequately secured and protected.

96.    Gryphon owed a duty to Plaintiff sand Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its custodianship, including adequately training its employees and others who accessed Private

26

Information within its computer systems on how to adequately protect Private Information.

97.     Gryphon owed a duty to Plaintiff and Class Members to implement processes or safeguards that would detect a breach of its data security systems in a timely manner.

98.     Gryphon owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

99.     Gryphon owed a duty to Plaintiff and Class Members to timely disclose if its computer systems and data security practices were inadequate to safeguard individuals' Private Information from theft because such an inadequacy would be a material consideration in Plaintiff and Class Members' decisions to entrust their Private Information to Gryphon.

100.    Gryphon owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when data breaches occur.

101.    Gryphon owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices and systems. Gryphon collected Private Information from Plaintiff and Class Members. Gryphon knew that a breach of its data systems would cause Plaintiff and Class Members to incur damages.

102.    Gryphon breached its duties of care to safeguard and protect the Private Information which Plaintiff and Class Members entrusted to it. Upon information and belief, Gryphon adopted inadequate safeguards to protect the Private Information and failed to adopt industry-wide standards set forth above in its supposed protection of the Private Information. Gryphon failed to design, maintain, and test its computer system to ensure that the Private Information was adequately secured and protected, failed to create and implement reasonable data security practices and procedures, failed to implement processes that would detect a breach of its data security systems in a timely manner, failed to disclose the breach to potentially affected customers in a

timely and comprehensive manner, and otherwise breached each of the above duties of care by implementing careless security procedures which led directly to the breach.

103.    Gryphon breached the duties set forth in 15 U.S.C. § 45, the FTC guidelines, NIST's Framework for Improving Critical Infrastructure Cybersecurity, and other industry guidelines. In violation of 15 U.S.C. § 45, Gryphon failed to implement proper data security procedures to adequately and reasonably protect Plaintiff's and Class Member's Private Information. In violation of the FTC guidelines, *inter alia*, Gryphon did not protect the personal customer information that it keeps; failed to properly dispose of personal information that was no longer needed; failed to encrypt information stored on computer networks; lacked the requisite understanding of their network's vulnerabilities; and failed to implement policies to correct security problems. In violation of the NIST's Framework, Gryphon, *inter alia*, failed to adopt sufficient resources to identify and address security gaps.

104.    Gryphon's failure to comply with applicable laws and regulations constitutes negligence per se.

105.    As a direct and proximate result of Gryphon's failure to adequately protect and safeguard the Private Information, Plaintiff and Class Members suffered damages. Plaintiff and Class Members were damaged because their Private Information was accessed by third parties, resulting in increased risk of identity theft, property theft and extortion for which Plaintiff and Class Members were forced to adopt preventive and remedial efforts. These damages were magnified by the passage of time because Gryphon failed to notify Plaintiff and Class Members of the Data Breach until weeks had passed. In addition, Plaintiff and Class Members were also damaged in that they must now spend copious amounts of time combing through their records to ensure that they do not become the victims of fraud and/or identity theft, as well as in the loss of

the benefit of their bargains.

## COUNT III

### Breach of Third-Party Beneficiary Contract

106. Plaintiff repeats and incorporates herein by reference each and every allegation above, inclusive, of this Complaint as if set forth fully herein.

107. Gryphon entered into written contracts with its RCM clients. Those contracts provided Gryphon with the benefit of obtaining Plaintiff and Class Members' sensitive Private Information, which it collected, aggregated, and stored in the ordinary course of business.

108. Under applicable statutes and regulations, these contracts obligated Gryphon to reasonably safeguard Plaintiff's and Class Members' Private Information from unauthorized third-party access by, *inter alia*, implementing reasonable and adequate data security safeguards to protect that data.

109. Gryphon breached the terms of its contracts with its RCM Clients by failing to implement the above-described reasonable and adequate data security safeguards. As a result, Plaintiff's and Class Members' Private Information was breached by unauthorized third-party hackers.

110. As a direct and proximate result of Gryphon's breach, Plaintiff and Class Members, who are third party beneficiaries of Gryphon's contracts, have been injured and have suffered—and will continue to suffer—injuries, damages, and harm as set forth herein.

## COUNT IV

### Quasi-Contract/Unjust Enrichment

111. Plaintiff repeats and incorporates herein by reference each and every allegation above, inclusive, of this Complaint as if set forth fully herein.

112.   This count is pled in the alternative to Plaintiff's Count III for breach of third party contract above.

113.   Plaintiff and Class Members conferred a monetary benefit on Gryphon by providing their Private Information to their healthcare providers, who are Gryphon's RCM Clients. Gryphon collected and received that Private Information through its regular business activities and aggregated, transferred and sued it for financial and pecuniary benefit.

114.   Gryphon appreciated that a monetary benefit was being conferred upon it by Plaintiff and Class Members and accepted that monetary benefit.

115.   However, Gryphon's acceptance of that benefit under the facts and circumstances— in particular, Gryphon's failure to implement reasonable data security safeguards, including proper vetting of its third party agents and vendors, along with its failure to disclose that failure—outlined above was unjust. In doing so, Gryphon enriched itself by saving the costs it reasonably should have expended to ensure such reasonable and adequate data security safeguards for the patient Private Information it was entrusted. In other words, Gryphon chose to increase its own profits at the expense of Plaintiff and Class Members by choosing to implement cheaper, non-effective data security measures.

116.   Under the principles of equity and good conscience, it is inequitable for Gryphon to retain the benefits conferred upon it by Plaintiff and Class Members without payment of the value thereof. If Plaintiff and Class Members knew that Gryphon would not secure their Private Information, they would not have agreed to provide it to their healthcare providers to provide to Gryphon.

117.   Plaintiff and Class Members, as a direct and proximate cause of Gryphon's wrongful actions and inactions, have been damaged and have suffered the injuries outline above. Plaintiff

and Class Members thus seek the disgorgement of Gryphon's proceeds that it unjustly received from them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all Class Members, respectfully request that the Court enter judgment in their favor and against Gryphon as follows:

1. For an Order certifying the Class as defined herein and appointing Plaintiff and their counsel to represent the Class;

2. For equitable relief enjoining Gryphon from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

3. For equitable relief compelling Gryphon to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity to Class Members the type of Private Information compromised.

4. For an award of damages, including actual and compensatory damages, in an amount to be determined at trial;

5. For an award of punitive and treble damages, in an amount to be determined at trial;

6. For an award of costs of suit, litigation expenses and attorneys' fees, as allowable by law; and

7. For such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and all others similarly situated, hereby demands a jury trial for all claims so triable.

Respectfully submitted,

*/s/ Craig D. Cherry*

Craig D. Cherry
S.D. Tex. No. 26692
Cherry Johnson Siegmund James LLC
7901 Fish Pond Rd., 2nd Floor
Waco, Texas 76710
Telephone: (254) 732-2242
ccherry@cjsjlaw.com

Jesenia A. Martinez*
**pro hac vice forthcoming*
Wilshire Law Firm, PLC
3055 Wilshire Boulevard, 12th Floor
Los Angeles, California 90010
Telephone: (213) 381-9988
jesenia.martinez@wilshirelawfirm.com
JeseniaMartinezsTeam@wilshirelawfirm.com

*Counsel for Plaintiff and the Proposed Class*